UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| MAYSIE D. AMOS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:18-CV-155-HBG |
| ) | |
| ANDREW M. SAUL,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), Rule 73 of the Federal Rules of Civil Procedure, and the consent of the parties [Doc. 21]. Now before the Court are Plaintiff's Motion for Judgment on the Pleadings and Memorandum in Support [Docs. 22 & 23] and Defendant's Motion for Summary Judgment and Memorandum in Support [Docs. 24 & 25]. Maysie D. Amos ("Plaintiff") seeks judicial review of the decision of the Administrative Law Judge ("the ALJ"), the final decision of Defendant Andrew M. Saul ("the Commissioner"). For the reasons that follow, the Court will **DENY** Plaintiff's motion and **GRANT** the Commissioner's motion.

## I.    PROCEDURAL HISTORY

On March 30, 2015, Plaintiff protectively filed an application for child's insurance benefits, alleging disability beginning on November 23, 2014, which was later amended to March 30, 2015. [Tr. 10, 285–305]. After Plaintiff's application was denied initially and upon reconsideration,

---

[1] Andrew M. Saul was sworn in as the Commissioner of Social Security on June 17, 2019, during the pendency of this case. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), Andrew M. Saul is substituted as the Defendant in this case.

Plaintiff requested a hearing before an ALJ. [Tr. 188–89]. An initial hearing was held on September 21, 2017 [Tr. 32–46], with a supplemental hearing held on December 13, 2017 [Tr. 47–59]. On January 25, 2018, ALJ Sherman D. Schwartzberg found that Plaintiff was not disabled. [Tr. 10–22]. The Appeals Council denied Plaintiff's request for review on August 28, 2018 [Tr. 1–6], making the ALJ's decision the final decision of the Commissioner.

Having exhausted her administrative remedies, Plaintiff filed a Complaint with this Court on September 14, 2018, seeking judicial review of the Commissioner's final decision under Section 405(g) of the Social Security Act. [Doc. 1]. The parties have filed competing dispositive motions, and this matter is now ripe for adjudication.

## II. ALJ FINDINGS

In his January 25, 2018 disability decision, ALJ Schwartzberg made the following findings:

> 1. Born on August 14, 1997, the claimant had not attained age 22 as of March 30, 2015, the alleged onset date (20 CFR 404.102 and 404.350(a)(5)).
>
> 2. The claimant has not engaged in substantial gainful activity since March 30, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: migraines, non-epileptic seizures, narcolepsy, anxiety disorder, and major depressive disorder (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except no climbing ladders, ropes, or scaffolds; no concentrated exposure to fumes and other respiratory irritants and all exposure to hazards; limited to simple, unskilled work with frequent contact with co-workers and public.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was born on August 14, 1997 and was 17 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 30, 2015, through the date of this decision (20 CFR 404.350(a)(5) and 404.1520(g)).

[Tr. 12–22].

## III. STANDARD OF REVIEW

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining whether the ALJ's decision was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner, and whether the ALJ's findings are supported by substantial evidence. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) (citation omitted); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted). It

is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citation omitted).

On review, the plaintiff "bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y. of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994) (citation omitted).

## IV. DISABILITY ELIGIBILITY

Plaintiff applied for child's insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–34. A claimant may be entitled to disability insurance benefits if they are at least 18 years old and has a disability that began before turning 22 years old. *See* 20 C.F.R. § 404.350(a)(5).

"Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will only be considered disabled:

> if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

4

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

Disability is evaluated pursuant to a five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity ("RFC") and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). A claimant's residual functional capacity ("RFC") is assessed between steps three and four and is "based on all the relevant medical and other evidence in your case record." 20 C.F.R. §§ 404.1520(a)(4), -(e) and 416.920(a)(4), -(e). An RFC is the most a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1).

The claimant bears the burden of proof at the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id.* At the fifth step, the Commissioner must prove that there is work available in the national economy that the claimant could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

## V. ANALYSIS

Plaintiff asserts that the ALJ's disability decision is not supported by substantial evidence, claiming that the ALJ failed to properly consider the effects of her narcolepsy on her ability to perform full-time work in the RFC determination. [Doc. 23 at 12]. Plaintiff alleges that after finding that her narcolepsy constituted a severe impairment, the ALJ then failed to properly assess the impact of this impairment or provide for any limitations due to the effects of her narcolepsy. [*Id.* at 9]. Further, Plaintiff maintains that narcolepsy was her primary reason for applying for disability, the ALJ improperly adopted the opinions of the nonexamining state agency consultants, and failed to recognize the limited extent of her medical improvement related to narcolepsy. [*Id.* at 9–11].

The Commissioner responds that the ALJ found that Plaintiff's testimony regarding her disabling limitations was inconsistent with the medical record, and properly found that Plaintiff's narcolepsy was treated conservatively and managed with medications. [Doc. 25 at 10]. Moreover, the Commissioner states that substantial evidence supports the ALJ's review of the improvement of Plaintiff's narcolepsy and related symptoms. [*Id.*]. Lastly, the Commissioner notes that no doctor provided an opinion that Plaintiff was more limited by her narcolepsy than opined by the nonexamining state agency physicians. [*Id.* at 11].

A claimant's RFC is the most that claimant can do despite his or her impairments. 20 C.F.R. § 404.1545(a)(1). In other words, the RFC describes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from—though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). An ALJ is responsible for determining a claimant's RFC after reviewing all the relevant evidence of record. *Rudd v. Comm'r of Soc. Sec.*,

531 F. App'x 719, 727–28 (6th Cir. 2013). "[W]hile an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his or her own lay medical opinion for that of a treating or examining doctor." *Smiley v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 592, 600 (S.D. Ohio 2013) (internal quotation marks and brackets omitted).

Here, the ALJ found that Plaintiff had the residual functional capacity to perform medium work, except that she could not climb ladders, ropes, or scaffolds, as well as that she could not have concentrated exposure to fumes and other respiratory irritants and all exposure to hazards. [Tr. 14]. Plaintiff, however, challenges the ALJ's alleged failure to include limitations related to her narcolepsy in the RFC determination.

Plaintiff reported difficulty with sleeping and fainting episodes to her primary care physician, Dr. Richard Gendron, on September 18, 2014, and was subsequently referred for a sleep study. [Tr. 579–81]. Dr. James Hansen administered the sleep study on November 23, 2014, and noted Plaintiff had a "history of daytime hypersomnolence, difficulty getting out of bed in the morning and falling asleep and school." [Tr. 570]. Dr. Hansen performed a multiple sleep latency test ("MSLT"), and assessed that Plaintiff's "[a]bnormal MSLT [was] consistent with narcolepsy based on the sleep onset latencies and the two [rapid eye movement] REM onset periods." [*Id.*]. Plaintiff was subsequently prescribed Provigil to reduce extreme sleepiness. When Plaintiff reported that she could not tolerate the Provigil on January 20, 2015, and was awake for three days straight until crashing, Dr. Hansen advised Plaintiff to decrease the medication dosage. [Tr. 656].

Plaintiff was then seen by her treating neurologist, Dr. Nathan Fountain, for migraine headaches and non-epileptic seizures on February 12, 2015. [Tr. 893]. Dr. Fountain's treatment notes reflect that Plaintiff reported that she had been diagnosed with narcolepsy and reviewed her

7

narcolepsy related symptoms. [*Id.*]. However, Dr. Fountain stated that he "very much doubt[ed]" that Plaintiff had narcolepsy, although noting that such a diagnosis was possible, because Plaintiff had never had a conversation about excessive daytime somnolence before in their extensive treatment relationship. [Tr. 894]. At a subsequent follow-up appointment on April 2, 2015, Plaintiff reported no improvement in her daytime hypersomnolence, while also noting that she was recently taken off of Provigil. [Tr. 920]. Plaintiff was also treated during this time by a psychiatrist, Paul Villeneuve, M.D., for treatment of increased stress and anxiety. [Tr. 933–48, 998–99]. During a June 3, 2015 examination, Plaintiff was reported as being alert and oriented, as well as that she was eating and sleeping well after the stress of high school graduation was over. [Tr. 998].

In her June 4, 2015 Function Report, Plaintiff stated that she falls asleep without any warning, needs reminders to take her medications, and has trouble following instructions. [Tr. 365–71]. Nonexamining state agency physician, James Millis, M.D., reviewed the evidence of record on July 13, 2015 and opined that Plaintiff could perform medium work except that she must avoid exposure to hazards and avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. [Tr. 70–73]. On September 15, 2015, nonexamining state agency consultant, Robert Weisberg, M.D., reviewed the evidence of record at the reconsideration level of the agency's review and opined a similar RFC. [Tr. 131–34].

Plaintiff continued to report difficulty sleeping on June 14, 2016 [Tr. 1583] and August 17, 2016 [Tr. 1364] during mental health treatment notes. Plaintiff was seen by neurologist Dr. Mark Quigg on August 26, 2016, and reported continued daytime hypersomnolence and typically being awake only two hours per day. [Tr. 1008]. Dr. Quigg ordered an additional sleep test, which was performed on October 24, 2016, stating that the results of the previous MSLT were noted to

8

potentially have been due to a delayed sleep phase. [Tr. 1008, 1015]. Dr. Quigg detailed that the results of Plaintiff's second MSLT demonstrated that she initially had trouble falling asleep quickly, but once given the opportunity to "sleep-in," she was able to sleep for more than twelve hours in a fourteen-hour span, and had the normal amount of REM sleep. [Tr. 1015]. Dr. Quigg stated that the results of the testing were compatible with circadian delayed phase sleep syndrome, showed no evidence of over-sleepiness, as well as no evidence for narcolepsy. [*Id.*].

Plaintiff continued reporting daytime somnolence to Dr. Villeneuve on December 13, 2016 [Tr. 1363], as well as stating on March 7, 2017 that the Celexa used to treat her depression caused sleepiness throughout the day [Tr. 1361]. Dr. Villeneuve subsequently discontinued Plaintiff's Celexa and prescribed an alternative medication [Tr. 1362], and Plaintiff reported that her condition was improving on April 12, 2017 [Tr. 1360].

Plaintiff then returned to see Dr. Hansen on May 30, 2017 with continued complaints of excessive daytime somnolence and difficulty waking up in the morning. [Tr. 1661]. Dr. Hansen's treatment notes indicate that Plaintiff had been intolerant of even low doses of Provigil, and she was prescribed Nuvigil to treat her narcolepsy. [*Id.*]. During a follow-up visit on July 11, 2017, Plaintiff reported a marked improvement in her ability to function while taking Nuvigil. [Tr. 1662].

While testifying at the initial hearing on September 21, 2017, Plaintiff stated that her primary medical problem is her sleep disorder, and that prior to taking Nuvigil, she was sleeping excessively during the day. [Tr. 35–37]. Prior to her new Nuvigil prescription, Plaintiff detailed a typical day of waking up around 8:30 a.m., eating and watching television, falling asleep for approximately three hours until around 1:30 p.m., being awake until approximately 6:00 to 8:00 p.m., at which point she would go back to sleep and wake up around 2:30 to 3:30 a.m., until falling

9

asleep again after having a bowl of cereal. [Tr. 38–39]. Plaintiff stated that after taking Nuvigil around 8:30 a.m., she could function "pretty good" until "about mid in the day," or around 2:30 or 3:00 p.m. [Tr. 36, 40]. Plaintiff testified that her medication dosage "probably" could be increased, but that she had not returned to her treating physician, although she would likely return to the doctor before her next hearing. [Tr. 36, 42].

Plaintiff then testified on December 13, 2017 that her Nuvigil prescription was helping in the mornings, and that she had been able to obtain a part-time job at a department store, wherein she would work four hours per day, three hours per week, while going into work at 9:30 a.m. [Tr. 50–53]. Plaintiff testified that when called in to work an afternoon shift for the first time, she was unable to complete the four-hour shift after falling asleep at the cash register. [Tr. 51–52].

In the disability decision, the ALJ found that Plaintiff's narcolepsy was a severe impairment. [Tr. 13]. In his RFC determination, the ALJ reviewed Plaintiff's testimony regarding her new part-time job and the effect of her medication wearing off in the afternoons. [Tr. 15]. Next, the ALJ detailed the medical record with respect to Plaintiff's narcolepsy, including Plaintiff's initial report of excessive sleepiness to Dr. Gendron and subsequent sleep study performed by Dr. Hansen on November 23, 2014. [Tr. 16]. The ALJ reviewed Dr. Hansen's finding of an abnormal MSLT consistent with narcolepsy based on Plaintiff's sleep onset latencies and two REM onset periods, Plaintiff's Provigil prescription, as well as the decrease in her prescription after reporting being unable to tolerate the initial dosage. [*Id.*].

The ALJ also reviewed Plaintiff's February 12, 2015 treatment with Dr. Fountain, including Dr. Fountain assessing that he doubted that Plaintiff had narcolepsy due to her not falling asleep while watching television, sitting in the waiting room, or other unusual times. [Tr. 17]. When detailing Plaintiff's second MSLT with Dr. Quigg, the ALJ noted that Dr. Quigg "assessed

that the findings were most consistent with [a] tendency for delayed sleep, a pattern normal with most young adults but [which] could be exaggerated in those with depression." [*Id.*]. Lastly, the ALJ noted Plaintiff's continued treatment with Dr. Hansen on May 30, 2017, new Nuvigil prescription, and marked improvement with the updated prescription. [*Id.*].

When reviewing Plaintiff's subjective complaints, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her medically determinable impairments were not entirely consistent with the overall record. [Tr. 18]. Specifically, the ALJ noted that Plaintiff's impairments, including her migraines, non-epileptic seizures, narcolepsy, anxiety, and depression, restricted her to medium exertional work with certain postural and mental limitations. [Tr. 19]. However, the ALJ found that "the record fails to substantiate the allegations of total disability," as Plaintiff's "migraines, non-epileptic seizures, and narcolepsy are conservatively treated and managed with medications without adverse side effects." [*Id.*]. Further, the ALJ assigned great weight to the opinions of Dr. Millis and Dr. Weisberg, who opined that Plaintiff had the ability to perform work at the medium level of exertion and should avoid concentrated exposure to fumes and other respiratory irritants, as well as avoiding all exposure to hazards. [*Id.*].

Ultimately, although Plaintiff would interpret the medical evidence differently, the Court finds that the ALJ's determination was within his "zone of choice." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that "[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way" and that as long as substantial evidence supports the ALJ's finding, the fact that the record contains evidence which could support an opposite conclusion is irrelevant) (quotations omitted); *see also Huizar v. Astrue*, No. 3:07CV411-J, 2008 WL 4499995, at *3 (W.D. Ky. Sept. 29, 2008) ("While

11

plaintiff understandably argues for a different interpretation of the evidence from that chosen by the ALJ, the issue is not whether substantial evidence could support a contrary finding, but simply whether substantial evidence supports the ALJ's findings."). "Rather, it is the Commissioner's prerogative to determine whether a certain symptom or combination of symptoms renders a claimant unable to work." *Luukkonen v. Comm'r Soc. Sec.*, 653 F. App'x 393, 402 (6th Cir. 2016) (citing 20 C.F.R. § 416.929(c)(1), -(d)(2)). The ALJ is responsible for weighing medical opinions, as well as resolving conflicts in the medical evidence of record. *Richardson v. Perales*, 402 U.S. 389, 399 (1971); *see also* 20 C.F.R. § 416.946(c) (stating the final responsibility for assessing a claimant's RFC rests with the ALJ).

Plaintiff claims that the ALJ did not make any determination on the impact of her narcolepsy on her ability to work, and it is "uncontradicted in the record" that she cannot perform sustained work over a forty-hour work week. [Doc. 23 at 10]. However, the ALJ reviewed the extensive medical record with respect to Plaintiff's narcolepsy and found that it was conservatively treated and managed with medications without adverse side effects. The Court finds that the ALJ's examination of the medical record with respect to Plaintiff's narcolepsy is supported by substantial evidence. *See, e.g.*, *Cowan v. Colvin*, No. 2:12-CV-559, 2013 WL 5409641, at *11 (E.D. Va. Sept. 26, 2013) ("Plaintiff was diagnosed with narcolepsy and sleep apnea by Dr. Barot. However, with regards to the RFC, the question is not diagnosis, but whether that condition requires limitations on Plaintiff's work. In this case, the ALJ's decision to not include sleep-related limitations in the RFC is supported by substantial evidence.") (internal citation omitted).

Moreover, the ALJ found Plaintiff's testimony regarding her disabling limitations inconsistent with substantial evidence in the medical record. *See, e.g.*, *Johnson v. Berryhill*, No. CIV-17-1004-STE, 2018 WL 2375698, at *4 (W.D. Okla. May 24, 2018) ("But the ALJ

considered Plaintiff's testimony, and explained why, in light of other evidence, he did not believe that the RFC required limitations related to sleepiness or fatigue. Plaintiff does not specifically challenge the ALJ's treatment of her testimony and the Court finds the ALJ's explanation sufficient."). The ALJ also assigned great weight to the opinions of the nonexamining state agency physicians, who examined the evidence of record at the initial and reconsideration levels of the agency's review. The ALJ found that these opinions were consistent with the medical evidence of record, and supported by medical signs and findings. [Tr. 19].

Plaintiff maintains that the ALJ did not provide for any limitations on the effects of her sleeping disorder in the RFC determination. However, while the ALJ could have more explicitly tied his discussion of the medical record regarding Plaintiff's narcolepsy to the limitations in the RFC determination, the ALJ limited Plaintiff to no climbing of ladders, ropes, or scaffolds, as well as no concentrated exposure to fumes and other respiratory irritants and all exposure to hazards. *See Bennett v. Colvin*, No. 2:12-0058, 2016 WL 1222432, at *8 (M.D. Tenn. Mar. 28, 2016) ("Defendant correctly notes that the RFC accounts for narcolepsy by stating that Plaintiff should not be exposed to any hazards . . . Plaintiff points to no evidence that supports any additional restrictions due to narcolepsy other than her own testimony.").

Accordingly, the ALJ's finding that Plaintiff could perform a modified range of medium work was within his "zone of choice," as the ALJ reviewed the medical record and effect of Plaintiff's narcolepsy in the RFC determination. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). Therefore, Plaintiff's assignments of error do not constitute a basis for remand.

## VI. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Judgment on the Pleadings [**Doc. 22**] will

be **DENIED**, and the Commissioner's Motion for Summary Judgment [**Doc. 24**] will be **GRANTED**. The decision of the Commissioner will be **AFFIRMED**. The Clerk of Court will be **DIRECTED** to close this case.

ORDER ACCORDINGLY.

/s/ Bruce Guyton
United States Magistrate Judge